THE STATE ex rel. JOHN T. BARKER, Attorney-General, Appellant, v. D. H. SAGE, Doing Business Under Name of SAGE BANKING COMPANY.

In Banc, April 10, 1916.

1. PRIVATE BANKS: Assets and Rights of Creditors: Power of State Court to Construe Own Laws. This court has the constitutional power to construe all constitutional provisions and legislative acts of this State applicable to private banks and bankers organized and existing under its laws, and to decide to whom the assets of an insolvent bank belong, and the priority of the rights of creditors thereto.

2. NATURAL PERSON: Right to Engage in Business. There is no constitutional inhibition against any natural person engaging in any business he may choose which is not *malum in se.*

3. ———: ———: Private Banking. Nor is there any constitutional provision limiting the power of the General Assembly to enact general laws providing for the organization of private banks, authorizing them to engage in a banking business, declaring their legal status, and prescribing the terms and conditions upon which they may carry on that business within this State.

4. PRIVATE BANKS: Corporations Sole. Since a private bank, though owned by a single individual, is by statute granted powers and privileges not possessed by natural persons or partnerships, and possesses only such powers and privileges as are

granted by statute, and cannot exist until it has complied with these statutes, and since the statutes completely segregate the bank's assets and business from its owner's private assets and business, it is a legal entity, a corporation sole, under the provisions of the Constitution (Art. 12, sec. 11) declaring that the term corporation "shall be construed to include all joint stock companies or associations having any powers or privileges not possessed by individuals or partnerships." If owned by more than one person, it is still a separate entity or *quasi*-corporation. [Disapproving Gupton v. Carr, 147 Mo. App. 105.]

5. ——————: ——————: Notwithstanding Words of Statute. The words of the statute (Sec. 1116, R. S. 1909) declaring that the owner or owners of a private bank may carry on a banking business "without being incorporated," were used to distinguish private banks from banks incorporated under the general banking laws; they were not intended to declare that a private bank, organized under the statutes and conducted according to their requirements, it not a separate legal entity, or a *quasi*-corporation, or a corporation sole.

6. ——————: ——————: Application of Assets. The assets of a private bank, belonging to a single individual, belong to the bank, and upon its insolvency should be used to pay its creditors, and if any surplus remains after they are paid, it should be used in paying the owner's individual creditors, if he too, is insolvent or has been adjudged a bankrupt in the Federal court.

7. ——————: Insolvency: Priority of Jurisdiction of State and Federal Court. The taking possession of a private bank by the Bank Commissioner is the first step in the bringing of a suit for the appointment of a receiver, and that step gives the circuit court jurisdiction of the cause, and a subsequent application for a receiver and the appointment of one cannot be said to be *coram non judice* because of the fact that, before the receiver is appointed, a petition asking that the bank's owner be adjudged a bankrupt is filed in the Federal court.

8. ——————: ——————: ——————: Bankrupt Proceedings Against Owner. Besides, the filing of a petition in the Federal court, asking that the owner of a private bank be individually adjudged a bankrupt, does not place the assets of his said bank *in custodia legis*—certainly not to the extent of depriving the State court of its jurisdiction to decide whether or not the creditors of the bank are entitled to be paid out of its assets before they can be used to satisfy its owner's individual creditors.

Appeal from Clark Circuit Court.—*Hon. N. M. Pettingill,* Judge.

REVERSED AND REMANDED.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State, plaintiff and appellant; *T. L. Montgomery* for McDermott Turner, Receiver, intervener and appellant and *W. M. Fitch* and *James P. Gilmore* for Erwin Fox, George W. Cannon and James Fulton, interveners and appellants.

(1) The Sage Banking Company was and is, under the laws of Missouri, a corporation, or corporate or artificial entity, separate and apart from D. H. Sage, individually, its organizer, and its assets, therefore, are not, and cannot be, affected by, nor subjected to, any proceeding in bankruptcy in and by any Federal courts. Sec. 11, art. 12, Mo. Constitution; Sec. 2963, R. S. 1909; Section 1, Clause 6, Bankruptcy Act, Collier on Bankruptcy, p. 2; Secs. 1117-1119, 1095, 1081, 1088, R. S. 1909; Clark & Marshall on Private Corporations, sec. 18; Dwight on Law of Persons and Personal Property, p. 580; State v. Turlery, 142 Mo. 410; Jones v. Williams, 139 Mo. 25; State ex rel. v. Payne, 129 Mo. 477; Matthews v. Skinker, 62 Mo. 329; Sec. 2990, R. S. 1909; Fargo v. Railroad, 6 Fed. 767; Insurance Co. v. Oliver, 10 Wall. 507; Society v. Brown, 213 U. S. 43.   (2) In any view of the case, an individual or private banker or bank, created by and organized under the statutes of Missouri, is not a natural person within the meaning of the bankruptcy acts of Congress, and the assets of the Sage Banking Company, therefore, are not, and cannot be, affected by, nor subjected to, any proceedings in or by any Federal court. Articles 1 and 2, Chap. 12, R. S. 1909; In re Guaranty & Trust Co., 121 Fed. 74; Perkins v. Smith, 116 N. Y. 441; People v. Young, 207 N. Y. 529; Ratcliffe v. People, 22 Colo. 78; Bassmet v. Jackson, 19 Fla. 667; Shadwell v. Phillips, 72 Minn. 521; Helena v. Rogan,

27 Mont. 138; United States v. Bashaw, 50 Fed. 753; Sener v. Ephrate, 176 Pa. St. 87; Nudgett v. Leibes, 14 Wash. 485; Ashland W. Co. v. Ashland Co., 87 Wis. 485; Lucas Co. v. Railroad, 67 Iowa, 211. (3) The Sage Banking Company, or D. H. Sage doing business under that name, if the court should hold the company not to be a corporate entity, is not a "natural person" within the meaning of the bankruptcy laws of the United States, but is, in any event, a separate entity from D. H. Sage, or David H. Sage, individually, and the assets of the Sage Banking Company, therefore, cannot be affected by, nor subjected to, any bankruptcy proceeding solely against David H. Sage. People v. Doty, 80 N. Y. 251; In re Kehler, 153 Fed. 237; In re Funk, 101 Fed. 244; In re Funk, 117 Fed. 786; Curtis v. Hollingshead, 14 N. J. L. 409; Lumber Co. v. Covert, 35 Mich. 260; Bank v. Burt, 93 N. Y. 245; Forsyth v. Woods, 11 Wall. 486; Walker v. Wait, 50 Vt. 675; Cooley v. Corsett, 39 Mich. 784; Cross v. Bank, 17 Kan. 340; In re Bertenshaw, 157 Fed. 363; Fidelity Trust Co. v. Gaskell, 195 Fed. 865; In re Junk & Balthazard, 169 Fed. 482. (4) No title passed to the trustee in bankruptcy in the proceedings in the Federal court of Iowa, for the reason that, prior to the filing of the petition in bankruptcy therein, said David H. Sage could not have by any means transferred the assets of the Sage Banking Company, and the same could not have been levied upon and sold under any judicial process against him, and, by reason thereof, the State court was without power to transfer said assets to said trustee. Maynard v. Bond, 67 Mo. 315; Casey v. Cavaroc, 96 U. S. 467; Kennedy v. Gibson, 8 Wall. 506; Casey v. Sociate, 2 Woods 77, 5 Fed. Cases 265; 3 Am. & Eng. Ency. Law, 98; Fish v. Olin, 76 Vt. 120; Relf v. Rundle, 103 U. S. 225; Parson v. Ins. Co., 31 Fed. 305; Gilman v. Ketchum, 84 Wis. 69; Ford v. Gilbert, 44 Ore. 262; Barnes v. Newcomb, 80 N. Y. 113; Walling v. Miller, 108 N. Y. 173; Thomp-

son v. McCleary, 159 Pa. St. 183; Edwards v. Norton, 55 Tex. 410; In re Tyler, 149 U. S. 164; Ells v. Water Co., 86 Tex. 109; Campau v. Club, 130 Mich. 417; Groscup v. Society, 162 Fed. 947; Martin v. Davis, 21 Iowa, 535. (5) The money, assets and property of the Sage Banking Company were *in custodia legis* long prior to the filing of the petition in bankruptcy, or were so situated as not to be affected thereby, and the circuit court of the State having first acquired jurisdiction thereover, has the right, and should be required, to retain jurisdiction and administer the estate and wind up the affairs of the Banking Company, under the statutes of Missouri. Collier on Bankruptcy, par. b, p. 992; Casey v. Cavaroc, 96 U. S. 488; Metcalf v. Barker, 187 U. S. 175; Jaquith v. Rowley, 188 U. S. 625; In re Rathman, 183 Fed. 924; Harris v. Bank, 216 U. S. 382; In re McMahon, 77 C. C. A. 668; Frank v. Volkmmoer, 205 U. S. 521; Hiscock v. Bank, 206 U. S. 41; Skilton v. Coddington, 185 N. Y. 80.

*Boyd & McKinley* for respondent.

(1) Where an adjudication of bankruptcy has been made by a court of bankruptcy the jurisdiction of that court to administer the property of a bankrupt is exclusive. Fidelity & Guaranty Co. v. Bray, 225 U. S. 205; Harvester Co. v. Lumber Co., 222 U. S. 300; In re Watts, 190 U. S. 1; Bank v. Gudger, 212 Fed. 49; In re McLoughlin v. Knop, 214 Fed. 260; In re Naval Stores Co., 214 Fed. 563; Morehouse v. Powder Co., 206 Fed. 204; Dry Goods Co. v. Crating Co., 206 Fed. 817; In re Telegraph Co., 196 Fed. 153; Lea v. West Co., 91 Fed. 237; In re Wagon Co., 110 Fed. 927; In re Fuller's Earth Co., 186 Fed. 578; In re Zeigler Co., 189 Fed. 259; In re Knight, 125 Fed. 35; Hooks v. Aldridge, 145 Fed. 865; In re Electric Supply Co., 175 Fed. 612. (2) The title to all the property of the bank-

rupt vests in the trustee in bankruptcy as of the date of filing the petition asking for the adjudication of bankruptcy. In re Sage, 224 Fed. 525; County Commissioners v. Hurley, 169 Fed. 94; Pugh v. Loisel, 219 Fed. 417; Toof v. Bank, 206 Fed. 250; In re Contracting Co., 212 Fed. 691; Bryan v. Bernheimer, 181 U. S. 188; Mueller v. Nugent, 184 U. S. 1; Everett v. Judson, 228 U. S. 474; Remington on Bankruptcy (2 Ed. 1915), secs. 117, 1112; Sec. 70, U. S. Bankruptcy Act, 30 Stat. L. 565; Sec. 47, U. S. Bankruptcy Act, 36 Stat. L. 840; Lazarus v. Prentice, 234 U. S. 263. (3) The title to the property of D. H. Sage, doing business under the firm name and style of Sage Banking Company, passed to the trustee in bankruptcy on the adjudication of bankruptcy in accordance with the provisions of the Bankrupt Act. Sec. 4-B, U. S. Bankruptcy Act, 36 Stat. L. 839; Sec. 1-A6, Bankruptcy Act, 30 Stat. L. 544; Sec. 1116-1118, R. S. 1909; In re Salmon & Salmon, 143 Fed. 395; In re Purl's Estate, 147 Mo. App. 105; 1 Remington on Bankruptcy (2 Ed. 1915), sec. 79; Burkhart v. Bank, 137 Fed. 958; In re Surety Trust Co., 121 Fed. 73; Couts v. Townsend, 126 Fed. 249; In re Kersten, 110 Fed. 929; In re Sage, 224 Fed. 525. (4) The special agent of the Missouri Banking Department and the receiver, McDermott Turner, were not and are not adverse claimants having a beneficial title to or claim upon the property of D. H. Sage, doing business under the firm name and style of Sage Banking Company. Bryan v. Bernheimer, 181 U. S. 188; Mueller v. Nugent, 184 U. S. 1; Harvester Co. v. Lumber Co., 222 U. S. 300; Shawnee County v. Hurley, 169 Fed. 94; Lazarus v. Prentice, 234 U. S. 266; Bank v. Cox, 143 Fed. 91; In re Sage, 224 Fed. 525. (5) State insolvency laws are superseded by or give way to Federal insolvency laws. In re Salmon & Salmon, 143 Fed. 395; In re Sage, 224 Fed. 525; In re Watts & Sachs, 190 U. S. 1. (6) The State court cannot incumber the assets of the bankrupt estate with

any liens or make any order appropriating or distributing any of the assets of the bankrupt estate after the bankruptcy proceedings attach. In re Sage, 224 Fed. 540; Black on Bankruptcy, sec. 27; Remington on Bankruptcy (2 Ed. 1915), sec. 1620; In re Hecox, 164 Fed. 875; In re Stave Co., 199 Fed. 952; In re Fuller's Earth Co., 186 Fed. 578; In re Rogers, 116 Fed. 435. (7) The Supreme Court of Missouri has no jurisdiction to determine this controversy as the act of the State court in appointing the receiver was *coram non judice.* In re Stave Co., 199 Fed. 952; In re Sage, 224 Fed. 540; Hickman v. Parlin-Orendorff Co., 88 Ark. 519; Harvester Co. v. Lumber Co., 222 U. S. 300; Pugh v. Loisel, 219 Fed. 417; County Commissioners v. Hurley, 169 Fed. 94. (8) The receiver appointed by the State court, McDermott Turner, has complied with the order of the lower court and paid or satisfied the judgment, and therefore this appeal should be dismissed. Noah v. Insurance Co., 78 Mo. App. 370; King v. Campbell, 107 Mo. App. 496; Cassell v. Fagin, 11 Mo. 207; Aull v. Trust Co., 149 Mo. 15; 3 Corpus Juris, 360, 368, 665, 675.

WOODSON, C. J.—This suit was instituted in the circuit court of Clark County, under the banking laws of this State, to determine the priority of the rights of the depositors and other creditors of the Sage Banking Company, of Alexandria, Missouri, a private bank, duly organized under the laws of this State, to the assets thereof, to the rights of the general creditors of D. H. Sage, the owner of the bank, who is a bankrupt.

The facts, in so far as this case is concerned, are briefly as follows:

On December 31, 1910, D. H. Sage subscribed and swore to, and acknowledged, the regular application or form for establishing or creating a private bank, under the provisions of articles 1 and 2, chapter 12, Revised Statutes 1909, and particularly sections 1116 and 1117

thereof, naming the person interested therein as D. H. Sage, residence, Alexandria, Missouri, the amount of capital as ten thousand dollars, the name in which the business was to be conducted as Sage Banking Company, and the business to be conducted at Alexandria, Missouri. This application was regularly filed in the office of the Recorder of Deeds for Clark County, Missouri, on the 3rd day of January, 1911, and a certificate to that effect made by the Recorder. Afterwards, the recorded document was filed with the Bank Commissioner of Missouri, and on the 9th of January, 1911, he duly issued his certificate to that effect, establishing the Sage Banking Company, at Alexandria, Missouri, with a capital of ten thousand dollars.

The Sage Banking Company, as thus organized and created, continued in the general banking business, receiving deposits, paying checks, etc., until October 17, 1914, when, under the provisions of section 1081, it posted on its door the following notice: "This Bank Is In The Hands Of The Bank Commissioner." Thereupon, the Bank Commissioner appointed McDermott Turner, special agent, under the provision of that section, who took charge of the bank and the assets thereof. He held the custody and charge of the bank and its assets until November 21, 1914, when the State, upon proper notice to the Attorney-General, by the Bank Commissioner, instituted the suit of "The State of Missouri, at the Relation of John T. Barker, Attorney-General, Plaintiff, v. D. H. Sage, doing business under the Style and Firm Name of Sage Banking Company, of Alexandria, Missouri, Defendant," in the circuit court of Clark County, Missouri, this suit, and, upon proper application and petition, the judge of that court, under the provisions of section 1081, appointed said McDermott Turner, theretofore special agent, the receiver of said Sage Banking Company, who immediately qualified and took charge of the bank and its assets as receiver of the Sage Banking Company.

On November 19, 1914, there was filed in the United States District Court for the Eastern Division of the Southern District of Iowa, a petition in bankruptcy, by creditors of David H. Sage, individually, praying that he be adjudged an involuntary bankrupt.

On November 25, 1914, an answer was filed for Sage, alleging that he had been domiciled at Keokuk, Iowa, for more than six months past, but that his actual residence during all of that time and prior thereto was at Alexandria, Missouri. Sage also admitted therein his willingness to be adjudged a bankrupt.

On November 27, 1914, David H. Sage, individually, was adjudged a bankrupt by the Referee in Bankruptcy of the Federal Court, reference having been made to him on November 25, 1914, by the clerk of that court.

On December 28, 1914, the attorney for Sage filed a schedule of his assets for him in the bankruptcy proceedings. The schedule is sworn to by the attorney, who, in affidavit, alleges the absence of Sage from Keokuk at that time. The schedule also alleges that the bankrupt was not sufficiently advised to know whether or not he should schedule the assets and liabilities of the Sage Banking Company, but undertook to attach a list of them.

David H. Sage, at the time of the filing of the petition in bankruptcy, was engaged in business at Keokuk, Iowa, operating a retail grocery store, under the name and style of Sage Bros. He was also engaged in the general mercantile business at Alexandria, Missouri, in his own proper name, David H. Sage, and also engaged in the general mercantile business, at Wayland, Missouri, under the name and style of Sage Mercantile Company.

On January 7, 1915, at a meeting of the creditors of David H. Sage, they elected and appointed Johnson B. Angle, Trustee in Bankruptcy, which action was approved by the referee.

On March 8, 1915, Johnson B. Angle filed his interplea in this case in the circuit court of Clark County, setting forth the filing of the petition in bankruptcy, the adjudication of David H. Sage as a bankrupt, the appointment and qualification of Johnson B. Angle, as trustee, and praying for an order vacating the appointment of the receiver, Turner, and to have the receiver turn over to the trustee in bankruptcy the property of the Sage Banking Company.

On April 5, 1915, the plaintiff, the State of Missouri filed its verified plea or answer to the trustee's interplea or application, and on the same day McDermott Turner, the receiver of Sage Banking Company, by leave of court, and Erwin Fox, George W. Cannon and James Fulton, depositors and creditors of Sage Banking Company, for themselves, and all others similarly situated, filed their separate verified pleas or answers to said interplea or application, denying the trustee's right to the assets of said bank, and claiming them for the use of the creditors of the bank.

Thereafter a hearing was had in the circuit court, evidence introduced, and the cause decided by the court in favor of the trustee in bankruptcy.

It was shown that at the hearing, the receiver, with the amount that had been turned over by the special agent, had collected and had on hand $30,068.32, and there were notes not yet collected in the sum of $43,236.34, making the amount involved, at least, $70,000. It was also shown that the claims of the depositors against the bank amounted to $59,517.16, and that there were 205 depositors.

In due time the State filed motions for a new trial, and in arrest of judgment, which were by the court overruled, and it duly appealed the cause to this court.

Thereupon, the trustee in bankruptcy presented an application in the United States District Court of Missouri for an order on Turner to turn over the assets

of the bank to him, and on June 20, 1915, the application was sustained.

From that order and decision the appellants in this court have taken an appeal to the United States Circuit Court of Appeals, but without giving a supersedeas bond, and the appellant, McDermott Turner, has complied with the order and turned over all of the assets in his possession belonging to "D. H. Sage, doing business in the name of Sage Banking Company," to the trustee in bankruptcy, as shown by exhibits to the motion to dismiss, the originals of which are filed with the clerk of this court.

The trustee in bankruptcy contended that the property and assets of the Sage Banking Company passed to him, and that he was vested with the right of possession thereto and the administration thereof. The State, the receiver, and the depositors and creditors contended that no title or right of possession ever passed to the trustee; that the Sage Banking Company was really a corporate entity, by virtue of the statutes of Missouri, or, in any event, an artificial being or entity, separate and apart from Sage individually; that the character of bank or banker involved was not within the meaning of the Bankruptcy Act; that the depositors and creditors of the bank were the beneficial owners thereof; that the capital, surplus and assets of the bank were separate and apart from the property and assets of Sage individually; that they were pledged and dedicated solely to the banking business, when the bank was established, and that, in any event, the depositors and creditors had a lien on or preferential, primary and exclusive claim thereto, which must be satisfied and discharged, prior to any rights of the other creditors of Sage attaching to any interest of his therein; that the property and assets of the Sage Banking Company were *in custodia legis* prior to any time involved that would give the Iowa court any right to take the same, and that the State court first became

possessed of them, and that its jurisdiction could not be in any way affected by the proceedings in the Federal court.

I. Counsel for the interpleader, the respondent, contends that there is but one legal proposition presented here for determination, and they state it in this language:

"The sole and only question for consideration is the right to the control of the assets of the Sage Banking Company. It is not a question of priority among creditors or preferred liens, as those questions are not an issue in this controversy and cannot be injected into the same through any straw men put up by appellants. Preferences and priority would have to come up on a proper issue in either the circuit court of Clark County, Missouri or in the United States Bankruptcy Court. The sole question in this litigation is to determine who shall administer the assets of the bankrupt."

*Administration of Assets of Insolvent Private Bank.*

This contention is most vigorously denied by counsel for the appellants; and upon the contrary, they insist that the primary and controlling questions are: first, that the Sage Banking Company is in the nature of a corporation sole, or is such a distinct entity that it and its business are entirely separated from D. H. Sage individually and his general business, and consequently that his bankruptcy in no manner affects the banking company; and, second, that because of said corporate character or distinct entity of said banking company, the acts of Congress regarding bankruptcy matters have no application thereto.

In my opinion the contention of counsel for the respondent is not sound; and I am also of the opinion that the contentions of counsel for the appellants correctly state the law of this State regarding the character of the Sage Banking Company, and that said acts of Congress were never designed to apply to or

embrace such an institution, any more than they would apply to an ordinary banking corporation, where one of its stockholders has been adjudged a bankrupt. In each case, the surplus of his interest in the bank, if any, remaining, after paying the corporate creditors, would be available under proper proceeding, for the payment of the bankrupt's general creditors.

Before proceeding to the discussion of the laws of this State, which in our opinion sustain the contentions of counsel for appellants, as before stated, we will dispose of a preliminary question regarding the authority of this court to decide the questions of law involved in this case, as presented by the record thereof.

Counsel for appellants insist that this court possessed that authority, while counsel for respondent deny that insistence.

There can be no question but that this court has the constitutional power to construe all constitutional provisions and legislative enactments of this State applicable to private banks and bankers organized and existing under the laws thereof, and to decide to whom the assets thereof belong, as well as their priority of rights thereto; but we do not deem it wise or proper to decide the incidental question thereto, as to whether or not the circuit court of Clark County has the legal right to administer the assets of the bank, for the reason the Federal court has the actual custody of the same; whether rightfully or wrongfully, we express no opinion, and we presume that court will finally dispose of the assets according to law.

II. This brings us to the discussion of the questions, what is a "private bank" and "a private banker," within the meaning of the laws of this State, and to whom do the deposits and assets thereto belong?

It should be borne in mind that there is no constitutional prohibition against a person engaging in any business he may choose, which is not *malum in se,*

nor is there such a provision limiting the power of the Legislature to enact general laws providing for the organization of private banks to engage in and carry on a banking business.

**A Private Bank is a Corporate Entity.**

That being true, and the Legislature being thus unrestrained in that regard, possessed the constitutional authority to enact the statutes of this State providing for the incorporation of general banking companies, and for the organization of private banks and bankers, and to declare their status before the law, and to prescribe the terms and conditions upon which they may do business in this State. Conceding that much to be true, which must be done, the constitutionality of said statutes must also be conceded, which only leaves the two questions for this court to decide, viz.: (1) What is a private bank or banker? and (2) To whom do the assets thereof belong, within the meaning of said statutes?

I will undertake to answer those questions in the order stated: First: This statement of the case necessarily calls for a careful consideration of the statutes providing for the organization of "private banks" or "private bankers" (the two terms being used interchangeably by the Legislature), their status before the law, as well as those conferring their power, imposing their duties and those which prescribe the terms and conditions upon which they may transact business in this State.

In order to correctly interpret those statutes, it should be remembered that prior to the Act of 1877 (Laws 1877, p. 34, secs. 22 to 29) there was no statutory law specially applicable to private banks.

Prior to the enactment of those statutes all such institutions were practically, if not literally, established by the person or persons desiring to enter into such business, who conducted the same according to his or their own ideas, as a part and parcel of his or their

general business, the precise thing counsel for respondent is here contending for, with the exception as to the organization of the bank and its supervision by the State—similar to the State's supervision of public warehouses.

Under those conditions counsel for respondent contend that when the owner of the bank failed in business the bank constituting an integral part of it, the deposits or assets of the same constituted a part and parcel of the general assets of his estate and should be administered accordingly in the payments of all of his creditors; and that the bank depositors have no preference over other creditors.

That condition of things, in many cases, would lead to great injustice and many hardships, in that the depositors parted with their money without receiving anything in return therefor, usually deposited it only for safe-keeping, while other creditors would become such for value received.

That act has been amended from time to time, with the design to protect the depositors from the injustice and hardships before mentioned; and as amended it has been carried into the various revisions of 1879, 1889, 1899 and 1909, and now constitutes a part and parcel of articles 1 and 2 of chapter 12 of the last named revision.

We will now set forth such of those statutes and parts thereof as are material to the legal propositions presented.

Section 1116, Revised Statutes 1909, declares what private bankers or private banks are, in the following language:

"Sec. 1116. *Private bankers defined.*—Private bankers are declared to be those who carry on the business of banking by receiving money on deposit, with or without interest, by buying and selling bills of exchange, promissory notes, gold or silver coin, bullion,

uncurrent money, bonds or stocks, or other securities, and of loaning money, without being incorporated.''

Section 1117 prescribes the terms and conditions upon which private bankers may conduct business in this State, which reads as follows:

"Sec. 1117. *Requirements for private banker— change of ownership.*—No person or company of persons shall engage in the business of banking as private bankers without a paid-up capital of not less than ten thousand dollars, and if said banking business is to be carried on in a city having a population of one hundred and fifty thousand inhabitants or more, then without a paid-up capital of not less than one hundred thousand dollars, nor until he or they shall have made a statement, subscribed and sworn to as correct and true before a notary public by each person connected with such business as owner or partner, setting forth: First, the names and places of residence of all persons interested in the business, all of whom shall be residents of this State, and the amount of capital invested; and second, the name in which the business is to be conducted and the place at which it is to be carried on; which statement shall be acknowledged, recorded in the office of the recorder of deeds of the county in which the bank is to be located, and a certified copy of such recorded instrument shall be filed in the office of the Bank Commissioner: Provided, however, that in order to accomplish a change in the ownership of a private bank, it shall be necessary for all the partners of the new bank to make, record and file in the office of the Bank Commissioner a statement in form and manner required by this section for establishing a new bank.''

And section 1118 confers upon a private banker the same powers and rights, and imposes upon him the same duties and obligations that are imposed upon duly incorporated banking companies; and in so far as is here material is as follows:

''No' private banker, who receives general deposits after the manner of banks of deposit and discount, shall employ any part of his capital, or any funds deposited with or borrowed by him, in dealing or trading in, buying or selling lands, goods, chattels, wares or merchandise, but he may sell and dispose of all kinds of property which may necessarily come into his possession in the collection of his loans or discounts. Nor shall any such banker use or employ his capital or funds deposited with or borrowed by him in any other manner than banks of deposit and discount are by this article permitted, or loan a greater amount to any person or loan any sum whatever, except upon like security as is required to be taken by banks of deposit and discount. Neither shall the profits of such private bank be distributed to the owners thereof without first setting apart to surplus account at least twenty per cent of the net profits of each year until the surplus equals twenty per cent of the capital, and said surplus shall not be diminished except for the payment of any losses which may occur: Provided, if there are undivided profits, these shall first be used in payment of such losses.''

Section 1119 provides that: ''All the provisions of this article shall, so far as the same are applicable, apply to all private bankers doing business in this State.''

Section 1095, Revised Statutes 1909, provides that, when any banking corporation, individual banker or trust company shall have filed the requisite certificate, paid incorporation fees and other fees, before such banking corporation or individual banker shall be authorized to do business, the Bank Commissioner shall ascertain whether or not the capital of the same has been paid in cash. It further provides as follows:

''In case the Bank Commissioner shall find that all the provisions of the law have been complied with by the institutions herein named, which desire to be

authorized to do business, he shall grant them a certificate to that effect. Such certificate, or certified copies thereof, shall be taken in all the courts of this State as evidence of such incorporation."

Section 1087 provides that:

"No private bank or banker in this State shall make any loan or discount on account of the personal security or obligation of the proprietor, owner or partner in such private bank in excess of ten per cent of the paid-up capital and surplus of such private bank or banker. For any violation of the provisions of this section, the Bank Commissioner shall have authority, in his discretion, to make application for the appointment of a receiver for such private bank or banker, as now provided by law in case of insolvent banks and trust companies."

Section 1081, Revised Statutes 1909, places individual or private banks under the same regulations as those incorporated under the first sections of article 2 of chapter 12. It reads:

"If, from an examination made by the bank commissioner, or by one of his examiners, it shall be discovered that any bank, private banker, savings and safe deposit company or trust company is insolvent, or that its continuance in business will seriously jeopardize the safety of its depositors or other indebtedness, and if the action is taken from an examination by an examiner, and such examiner shall recommend the closing of the bank, then it shall be the duty of the Bank Commissioner, if he approve such recommendation, by himself or one of his examiners, immediately to close said bank, private bank, savings and safe deposit company or trust company, and to take charge of all the property and effects thereof. Upon taking charge of any bank, private bank, savings and safe deposit company or trust company, the Bank Commissioner shall, as soon as practicable, ascertain, by a thorough examination into its affairs, its actual financial condition, and

whenever he shall become satisfied that any such bank, private banker, savings and safe deposit company or trust company cannot resume business or liquidate its indebtedness to the satisfaction of all its creditors, he shall report the fact of its insolvency to the Attorney-General, who shall immediately, upon the receipt of such notice, institute proper proceedings in the proper court for the purpose of having a receiver appointed to take charge of such bank, private bank, savings and safe deposit company or trust company, and to wind up its affairs and business thereof, for the benefit of its depositors, creditors and stockholders; and it is made the duty of the court, or the judge thereof in vacation, summarily to appoint said receiver to take possession of the property and assets of said bank, private banker, savings and safe deposit company or trust company, for the purpose of winding up the business thereof; any complaints or opposition of the bank, private banker, savings and safe deposit company or trust company or its officers subsequently to be heard in open court. The Bank Commissioner may appoint a special agent to take charge of the affairs of an insolvent bank, private banker, savings and safe deposit company or trust company temporarily, until a receiver is appointed; such agent to qualify, give bond and receive compensation the same as a regularly appointed examiner of the department of banking; such compensation to be paid by such bank, private banker, savings and safe deposit company or trust company, or allowed by the court, as costs in case of the appointment of a receiver: Provided, that in no case shall any bank, private banker, savings and safe deposit company or trust company continue in charge of such special agent for a longer period than sixty days. Any bank, private banker, savings and safe deposit company or trust company receiving deposits and doing business in this State under the laws cited in this chapter, may place its affairs and assets under the con-

trol of the Bank Commissioner by posting a notice on its front door as follows: 'This bank (or trust company) is in the hands of the Bank Commissioner.' The posting of this notice or of a notice by the Bank Commissioner that he has taken possession of any bank, private bank, savings and safe deposit company or trust company, shall be sufficient to place all of its assets and property, of whatever nature, in the possession of the Bank Commissioner and shall operate as a bar to any attachment proceedings whatever."

This section uses the words "individual" bank or banker and "private" banks or bankers as synonymous terms.

Section 1088 makes it the duty, among other things, of every bank, private bank or banker, savings and safe deposit company or trust company, receiving deposits, to cause to be made, not less than once each year, by a committee of at least three of its shareholders, an examination of the condition of its affairs, assets and liabilities, and the books and other documents thereof, and file their written report, one copy thereof with the institution, and a duplicate thereof with the Bank Commissioner: "Provided, however, that should any such corporation or private bank or banker not have any owners or directors, other than the officers thereof, that then and in such event, said examination and report may be made by such officers, and it is hereby made their duty so to do, under the same penalties as above provided."

By a careful reading of statutes before set out, it will be seen that section 1116 defines a private bank or banker to be one or more persons "who carry on the business of banking by receiving money on deposit, with or without interest, by buying and selling bills of exchange, promissory notes, gold or silver coin, bullion, uncurrent money, bonds or stocks or other securities, and of loaning money, *without being incorporated*." (Italics are ours.)

Private bankers have no other rights and powers than those just stated, for the reason that "*expressio unius est exclusio alterius;*" and section 1117 provides for the creation of an individual or private bank, and forbids any other person or company from engaging in the business of private bankers unless they comply with the provisions thereof, which have been hereinbefore copied.

From the foregoing observations it will be seen that no person or persons can engage in the private banking business, except upon compliance with the terms of said section 1117; and not until then are they private bankers, nor until then do they possess the rights and powers of private bankers, which are stated in said section 1116; but when they have complied with the provisions of that section, then they become and are private bankers; and consequently possess the powers and privileges not possessed by other individuals or partnerships. That being true, then under the plain and unambiguous language of section 11 of article 12 of the Constitution of 1875, all such bankers constitute a corporation.

That section reads as follows:

"The term corporation, as used in this article, shall be construed to include all joint stock companies or associations *having any powers or privileges not possessed by individuals* or partnerships."

A foreword before proceeding:

The Sage Banking Company was originally organized by D. H. Sage and his brother; the latter having retired from business, the former reorganized the bank individually, as provided for by said section 1117.

It has been suggested that the last three words, "without being incorporated," of section 1116, declaring what is a private bank, are inconsistent with the idea that private banks are corporations. That would be true if read alone; but when read in connection

with all the other statutes applicable to such banks and those governing banks incorporated and to be incorporated under the general bank laws, it will be seen that those words were used to distinguish private banks from banks incorporated under the general banking laws of the State.

It has been suggested that because of the facts that a private bank may, under the statute, be organized by a single individual or more, that no charter is issued to it; that no provision is made for the issuance of stock to the incorporators, or for the election of officers and a board of directors, etc., it cannot be logically maintained that it was the design of the Legislature that private banks should be incorporated.

It is true private banks are not incorporated under the statutes as other banks are, yet under a general statute, the Bank Commissioner is empowered to issue to such person or persons, as may desire to engage in the private banking business, a certificate authorizing him or them to so do, upon complying with the provisions of section 1117, which, at least, constitutes such an institution a separate legal entity, or a quasi-corporation, completely separating its business from the general business of the proprietors thereof.

This idea will be enlarged upon during the course of the opinion.

I fully appreciate the force of that argument; but if we consider the unlimited power of the Legislature in that regard, as I have previously pointed out, with no design expressed on its part to abolish private banks which were numerous at the time of the adoption of the Constitution and at the time the statutes mentioned were enacted, I am of the opinion that the Legislature intended to remedy the evils previously mentioned and not to abolish the private banking business, and that in order to do so, it was necessary to completely segregate the private banking business of the State from the solidarity of the owner's general busi-

ness and make each rest upon its own· bottom, and thereby make a private bank a separate and distinct entity from the general business of the owner and subject the assets thereof, first, to the payment of the bank's creditors, and, second, if thereafter any remains, they might go under the general laws to the payment of the general creditors; and yet not to disturb the ownership of the bank or its management or control by the owners, as provided by law.

Such an entity, as before suggested, might more properly be designated as a *quasi*-corporation when owned by more than one person, and a *quasi*-corporation sole, when owned by but one person, with their rights, powers, duties and obligations conferred and defined by statute.

This is the clear common sense reading of the statutes, and they fully remedy the evils which led to their enactments.

Sections 1118 and 1119 before quoted place the business of a private bank in the same situation as that of an ordinary incorporated bank under the laws of this State, and provide that "all the provisions of this article (2) shall so far as the same are applicable, apply to all private bankers doing business in this State."

Further clarity will be added to the conclusions before stated when we consider those sections of the statute governing general banks and general banking business in connection with those that are specially applicable to private banks.

The following provision found in section 1087 strongly indicates a complete separation of the private bank and its business from all other business of the organizers and owners thereof, viz.:

"No private bank or banker in this State shall make any loan or discount on account of the personal security or obligation of the proprietor, owner or partner in such private bank in excess of ten per cent of the paid-up capital and surplus of such private bank or

banker. For any violation of the provisions of this section, the Bank Commissioner shall have authority, in his discretion, to make application for the appointment of a receiver for such private bank or banker,'' etc.

This language of the statute clearly indicates that the Legislature understood that it had segregated the private bank from the general business of the owner thereof, had formed it into a separate entity or a *quasi*-body corporate, and had thereby prevented the assets thereof from being commingled with and owned by the organizers of the bank in his individual capacity; and at the same time had subjected those assets to the payment of its creditors in preference to the other creditors of the owner of the bank as previously stated. If that was not the intention of the Legislature, then why did it provide in said section that a *private bank* shall not lend more than ten per cent of its paid-up capital stock and surplus to the owner of the bank, etc.? If the money deposited in the bank, and its assets belong individually to the proprietor or owner thereof, as contended for by counsel for respondent, and that, therefore, the bank is only a coffer or a vault in which they are placed by him for safe keeping, then why did the Legislature make it unlawful for that coffer or that vault to lend to the owner of the same more than ten per cent of his own money, which he had placed therein for safe keeping, and could lawfully use any or all of it as he saw proper to do? I am unable to understand how a strong box or an arched structure with strong doors can act in any manner whatever, much less to count out and lend money, and to distinguish its owner from other persons. Nor can I understand, if counsel for respondent is correct, why a receiver should be appointed for said coffer or vault, or how it could be dissolved by an order of court, and its business affairs wound up and its assets distributed among its creditors, as is provided for by section 1081, when it never

had any being (except a physical one), assets or creditors. In that case the bank or coffer and its contents belong to the organizer of the bank, and all may be seized and taken to pay the owner's general creditors. In other words, according to the contention of counsel for respondent, a private bank, under the laws of this State, has no legal existence, nor capacity to transact business upon its own account; but at most, it is only a depository for the safe-keeping of the money deposited therein, which belonged to the owner of the bank, and it may be taken for the payment of his individual debts in general.

If that is true, then there is but one theory under the sun, known to man, by which it can be lawfully done, and that is upon the theory that when a person deposits money in a private bank he is simply lending the same to the owner of the bank, through it as his agent; and therefore it may be taken for the payment of his general indebtedness. No such design can be gathered from the legislation of this State upon that subject; and I am sure that such is not the understanding of the depositors of such institutions. Moreover, if such banks are not separate entities, then the law of the State has clothed the wolf in sheep's clothing, and thereby induced the people of this State to lend their money to individuals under the belief and understanding that they were depositing them in such institutions for safe keeping, safeguarded by stringent penal laws against being used and speculated with by the proprietors thereof. All of those matters point to the fact that such banks are separate entities—transacting business upon their own account, just the same as all other classes of banks do, and their assets must be first used for the payment of their liabilities.

Again: By sections 1080 and 1085, all private banks of this State are required to be examined so often by the Bank Commissioner, and a penalty is prescribed for any such bank refusing to submit to such

examination. Is that consistent with the idea that the
bank and all of its assets are the individual property
of the owner of the bank? I think not; for the very
object of such examinations is to ascertain the solvency
or insolvency of the bank, for the protection of the
depositors and other creditors of the institution, as
well as the community at large. That being true, what
good purpose would be served by such examinations if
the bank is not a corporate body and does not trans-
act business on its own account, but is, as contended
for by counsel for respondent, only an instrumentality
with which the owner of the bank transacts a part of
his individual business; and that the assets thereof be-
long to him in the same sense that he owns a farm with
the stock thereon, a store with the merchandise therein
or any other business enterprise? I submit no good
whatever would be realized therefrom, for the obvi-
ous reason that if the bank is not a separate entity, but
is an integral part of the general assets of its owner,
then his solvency or insolvency would determine the
solvency or insolvency of the so-called bank; and the
financial condition of the latter could not be ascertained
by an examination made by the Bank Commissioner
without he should also investigate the financial condi-
tion of the owner of the bank. The owner of the bank
might be indebted, for instance, in the sum of $250,000,
and have only $50,000 worth of individual assets out-
side of those deposited in the bank, and $100,000 de-
posited therein. In that case his indebtedness would
exceed his combined assets, those in and out of the
bank, by the sum of $100,000, yet that fact would not
and could not appear from an examination of the finan-
cial condition of the bank only; and consequently the
examination of the bank would not be worth a penny
to any one.

Again: Suppose the contention of counsel for re-
spondent is right, and that a private bank is absolutely
solvent, that is, it has more money and other valuable

assets on hand than are necessary to pay every dollar of its indebtedness; and at the same time the owner of the bank is hopelessly insolvent, that is, his assets in and out of the bank are wholly insufficient to pay his indebtedness, which of course, according to the contention of said counsel, includes the indebtedness of the bank; and suppose further that under those conditions the owner of the private bank should receive deposits for the bank when he knew of said insolvency, would the owner in that case be guilty, under the statutes of this State, of the crime of receiving deposits for the bank after he knew of *his insolvency*? In my opinion, that question should be answered in the negative, for the reasons that the statute refers to the insolvency of the bank itself, and not to the insolvency of the individual owner thereof; and there is no statute of that character applicable to a person who receives deposits of money from others in his individual capacity.

Moreover, section 1089 provides that if the Bank Commissioner shall report that any such bank is insolvent when it is solvent, or solvent when it is insolvent, he shall be liable on his official bond for all damage done thereby.

Now, if the contention of counsel for respondent is correct, then how could the Commissioner ascertain whether the bank is solvent or insolvent if it is not a separate entity, and he has no authority to investigate the financial condition of the owner of the bank? Under that assumption he could by no possible means ascertain the financial condition of any private bank in the State, and would thereby render himself liable on his bond in every case where the owner of the bank should happen to be insolvent at the time the examination is made, notwithstanding the fact that the bank itself was perfectly solvent.

Not only that, section 1091 provides that whenever the Bank Commissioner shall neglect or violate any of

the duties of his office regarding such banks, etc., he shall be deemed guilty of a felony, etc.

This clearly shows that such a bank is a separate institution from all other business of its owner, for otherwise the Commissioner would have no authority to examine such banks or discharge his numerous other duties regarding them.

There are other provisions of the statutes lending strength to the views herein expressed; but in my opinion those considered clearly establish the fact that *all private banks* in this State are *separate entities* from all other business enterprises of the owners or proprietors thereof; and therefore no good would flow from a further consideration of those statutes.

The St. Louis Court of Appeals, in the case of Gupton v. Carr, 147 Mo. App. 105, held contrary to the views here expressed; but we are clearly of the opinion that our learned brothers of that court misconceived the very object and purpose the Legislature intended to accomplish by the enactment of the statutes under consideration, and, therefore, drew erroneous conclusions as to the meaning of said legislation. We are, therefore, of the opinion that said case should be overruled, and it is accordingly done.

I am therefore clearly of the opinion that the assets of the Sage Banking Company belong to that institution, and for that reason its creditors have a priority of right to them over the rights of the creditors of D. H. Sage, and that they should be first applied in payment of their claims, and second, if any remains thereafter, then in payment of his individual creditors as provided by law.

III. The respondent has filed a motion in this court to dismiss the appeal for the reason that the act of the circuit court of Clark County appointing Turner

receiver of the Sage Banking Company, was *coram non judice*—the application for said appointment having been made subsequent to the filing of the petition asking that said Sage be adjudged an involuntary bankrupt.

**Priority of Jurisdiction.**

There are other grounds also assigned, but they are all germane to the one stated; and the disposition of that will dispose of all.

There is no merit in the motion, for two reasons: first, because the bank was in the hands of the Bank Commissioner, through his agent, Turner, before the petition in bankruptcy had been filed against D. H. Sage. The taking possession of the bank under section 1081 is the first step taken in bringing suit under sections 1082 and 1083, for the appointment of a receiver thereof, and to wind up the affairs of the bank; and that possession of the property by the Commissioner was sufficient custody thereof to give the circuit court jurisdiction of the cause. And, second, the filing of the petition in bankruptcy against D. H. Sage, individually, did not place the assets of the Sage Banking Company *in custodia legis;* evidently not to the extent of depriving the circuit court of its jurisdiction to pass upon the questions here presented.

For the reasons stated, the motion to dismiss the appeal is overruled.

For the reasons stated the judgment of the circuit court is reversed and the cause remanded. *Graves, Blair* and *Revelle, JJ.,* concur; *Bond, J.,* dissents; *Walker* and *Faris, JJ.,* absent.

## ON MOTION TO MODIFY.

GRAVES, J.—The motion to modify the opinion should be sustained *in toto.* All except the first ground of the motion refer to mere clerical oversights, and should be granted without argument, and as I understand, the opinion will be corrected in these details.

The first ground of the motion requests us to strike out the following clause from the opinion:

"But we do not deem it wise or proper to decide the incidental question thereto, as to whether or not the circuit court of Clark County has the legal right to administer the assets of the bank, for the reason the Federal court has the actual custody of the same; whether rightfully or wrongfully, we express no opinion, and we presume that court will finally dispose of the assets according to law."

This clause should be stricken out because it conflicts with the real holding in this case. The opinion elsewhere decides just what this clause says we will decline to decide. To get the connection we will state the facts. The opinion holds, and rightfully holds, that this court can decide the question as to whom these assets belong. The opinion then discusses our State laws, and very rightfully concludes that the circuit court of Clark County rightfully became possessed of these assets by and through a receiver appointed by it. The opinion, in the last paragraph thereof, after correction by inserting the word "not," rightfully holds, that "the filing of the petition in bankruptcy against D. H. Sage, individually, did *not* place the assets of the Sage Banking Company *in custodia legis.*"

Further the appeal in this case was taken from the order of the circuit court directing its receiver to turn over these assets to the trustee in bankruptcy of the Federal court, appointed on an application which we say did not place the assets *in custodia legis*. This judgment of the circuit court of Clark County our opinion reverses. In other words, we say the judgment directing the receiver in the circuit court to transfer the assets to the trustee in bankruptcy was wrong, and that the circuit court should have held that the trustee in bankruptcy had no title or interest in the assets, and was not entitled to the possession.

These holdings in the opinion are in direct conflict with the clause asked to be stricken out by this motion. That clause says we will not decide whether or not the circuit court has the legal right to administer the assets of the bank, which directly contravenes all else that is said in the opinion. When we reverse the judgment of the circuit court, as we do, it is tantamount to saying that the administration of the estate was properly in that court. This for the reason that the judgment we reverse is one by which the circuit court of Clark County divested itself of the administration of the estate. Not only this, but when we said that the petition in bankruptcy did not place the assets involved here *in custodia legis,* we in effect said that the bankruptcy court could not administer these assets. And yet further, when we say, as we do in the opinion, that the Sage Banking Company is, under our law, such a legal entity as not to bring it within the terms of the bankruptcy act, we necessarily say that the administration of these assets is in the State court.

The clause mentioned in appellant's motion to modify our opinion should be stricken from the opinion. It escaped my attention at the time I concurred in the opinion.

We should do in this case, just as this court did in State ex rel. v. Woodson, Judge, 164 Mo. 440. In that case, as in this, the court of the State had divested its receivers of the right to administer the estate and directed them to turn over the assets to the receivers of the Federal court. In that case, as it is claimed in this case, the receivers in the State court had turned over to the receivers in the Federal court.

The appeal in that case, just as in this case, was from the order of the State court divesting itself and its receivers of the administration of the estate. This court held that the administration was properly in the State court, and quashed the order which took such administration from the State court to the Federal

court. In other words we decided which court had jurisdiction of the estate, as we have done in this case, save and except what is said in the clause mentioned.

The motion to modify the opinion should be and is sustained and opinion modified as herein indicated. *Faris, Blair* and *Revelle, JJ.,* concur; *Woodson, C. J.,* dissents to this opinion; and *Bond, J.,* dissents as to both opinions.