STATE EX REL. BUTTE FRUIT & PRODUCE CO., RELATOR, *v.* DISTRICT COURT ET AL., RESPONDENTS; HOLEM ET AL., INTERVENERS.

(No. 5,899.)

(Submitted February 25, 1926. Decided March 13, 1926.

[244 Pac. 489.]

*Supervisory Control — Banks and Banking — Private Banks Owned by Partnership—Each Bank Separate Entity—Marshaling of Assets of All Banks for Joint Benefit of All Creditors not Authorized—Trusts.*

1. On application for writ of supervisory control, *held*, under the state banking law, that where a general partnership conducted a number of private banks in different cities which all became insolvent, each bank was a separate entity, regardless of its ownership; that the assets of each were impressed with a trust in favor of its own creditors only, and that therefore the assets of all the banks could not be marshaled as a common fund for the joint benefit of the creditors of all of them.

---

[1] Banks and Banking, 7 C. J., sec. 2, p. 474, n. 10 New; sec. 10, p. 480, n. 55; sec. 19, p. 487, n. 99 New; sec. 541, p. 747, n. 40, 41; sec. 562, p. 754, n. 14 New; sec. 584, p. 760, n. 1. Corporations, 14 C. J., sec. 505, p. 383, n. 42.

APPLICATION for a writ of supervisory control by the State, on the relation of the Butte Fruit & Produce Company, directed

to the District Court of the Second Judicial District, in and for the County of Silver Bow, Wm. E. Carroll, a Judge thereof, the District Court of the Sixth Judicial District in and for the County of Park, Hugh J. Miller, Judge thereof, and the District Court of the Thirteenth Judicial District in and for Yellowstone County, and Robert C. Stong, a Judge thereof, in which Frank Holem and others intervened. Proceeding dismissed.

*Mr. J. A. Poore,* for Relator, submitted a brief and argued the cause orally.

*Messrs. Kremer, Sanders & Kremer,* for Respondent District Court of the Second Judicial District, and *Wm. E. Carroll,* a Judge thereof, submitted a brief; *Mr. Louis P. Sanders* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. A. H. Angstman,* Assistant Attorney General, for Respondents, District Courts of Park and Yellowstone Counties, submitted a brief; *Mr. Angstman,* argued the cause orally.

*Messrs. O'Connor & Miller,* for Interveners Frank Holem and others, submitted a brief; *Mr. James F. O'Connor* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Application for a writ of supervisory control.

The facts set forth in relator's petition will appear sufficiently from the following statement.

For some time prior to March 24, 1924, pursuant to the laws of Montana, Christian Yegen and Peter Yegen, copartners, were conducting private banks in Butte, Billings and Gardiner, under the firm name and style of Yegen Bros., Bankers.

Upon the date above mentioned, the attorney general commenced three actions in which he asked for the appointment of a receiver for each of the three banks; an action in each county in which the respective banks were located. In each of the complaints it was alleged that about February 28, 1924, the superintendent of banks had examined into the business affairs and financial condition of the three banks owned and operated by the said copartnership, and from such examination he had ascertained and determined that· the assets of each of the banks were impaired and he so reported to the governor; and that thereupon the governor, about March 6, 1924, directed the attorney general to commence the suits. (Sec. 6103, Rev. Codes 1921.)

Such proceedings were taken in the three actions that each court appointed a receiver for the bank within its particular district. The respective receivers qualified and entered into the discharge of their duties. Pursuant to his delegated powers each took charge of his particular bank and proceeded to collect its assets and ascertain its liabilities; and each took the steps usually employed in winding up the affairs of an insolvent bank. So far as we are informed, at the time this proceeding was commenced each receiver was treating the bank of which he was in charge as an entity, and, apparently, as separate and apart from the other business operations of Christian and Peter Yegen as copartners, if they had any further business. The record does not disclose whether they as copartners, or otherwise, were engaged in any other business than that of conducting the three banks. The relator alleges that on the 24th of March, 1924, it was, and for a long time prior thereto had been, a creditor of Yegen Bros. Bankers, and of Yegen Bros., a copartnership, having on deposit in the Butte bank funds and moneys belonging to it amounting to the sum of $2,543.44. It avers that the assets of the Butte bank ultimately available for distribution among those thereunto entitled will not be to exceed twenty per cent, that the assets of the Billings bank will not pay the creditors in

excess of fifty per cent but will pay a final dividend sub-
stantially in excess of all the dividends the Butte bank will
pay, and that the assets of the Gardiner bank will not pay
to exceed seventy-five per cent but will pay a final dividend
substantially in excess of all the dividends the Butte bank
will pay. That the receiver of the Butte bank has been au-
thorized to declare and pay a partial dividend of five per cent
to the creditors of the Butte bank, and the receiver of the
Billings bank has been authorized to pay a partial dividend
of ten per cent to the creditors of the Billings bank.

It is further alleged that the receivers of the Billings and
Gardiner banks will declare additional dividends and pay the
same to the creditors of those banks, but no order will be
made by either the district court of Yellowstone county or
the district court of Park county for the payment of any
dividends to the creditors of the Butte bank, to the irreparable
injury and damage of relator. He therefore asks this court
to issue a writ of supervisory control designed to bring about
a marshaling of all of the assets of Yegen Bros., a copartner-
ship, and directing that all the creditors of Yegen Bros., a co-
partnership, be paid *pro rata* from the total assets. Upon the
application an order to show cause was issued. The courts and
judges made parties defendant answered severally. Each ad-
mits the facts alleged in the petition and avers that such facts
are insufficient to warrant granting the relief prayed.

At the hearing certain creditors of the Gardiner bank, by
reason of having deposited money therein prior to the ap-
pointment of the receiver, and the receiver, were permitted
to file a complaint in intervention, to which the relator has
demurred on the ground that the complaint does not state
facts sufficient to warrant the relief sought by the interveners.
The interveners, after alleging that they are creditors whose
claims have been allowed and approved, say that if the relief
prayed for by the relator be granted, then the assets which the
interveners will share in the payment of their claims against
the Gardiner bank will be reduced so that they will receive

not to exceed fifty per cent instead of seventy-five per cent of their claims. They allege that the receiver, by authority of the court, appears for and on behalf of the creditors of the Gardiner bank. They then allege that the Gardiner bank complied in all respects with the banking laws of the state of Montana, and that pursuant to those laws statements showing the financial condition of the bank were duly published in a newspaper published in Park county, Montana, copies of which publications are attached to the complaint in intervention; that in connection therewith they became creditors of the Gardiner bank by depositing money therein, and all of their deposits were made solely and exclusively in reliance upon the published statements of the financial condition of the bank, which showed only the assets and liabilities of the Gardiner bank and did not include the assets and liabilities of the Billings or Butte banks; that the interveners never would have deposited money in the Gardiner bank if they had known that the assets of that bank were to be charged with the liabilities of the banks at Butte and Billings; that the interveners relied upon and believed the financial statements and by reason thereof became creditors of the Gardiner bank. They allege that as creditors of the Gardiner bank they are entitled to a preference over the creditors of the Butte and Billings banks and over the general creditors of Peter Yegen and Christian Yegen, the individual partners composing the said copartnership, in the payment of debts out of the assets of the Gardiner bank, and allege that it is incumbent upon the relator to first exhaust all the assets and property owned by the Butte bank before attempting to share any of the other assets of the copartnership; that from the date of the opening of the bank at Gardiner until its closing it was operated as a distinct and separate banking institution which had no securities, collaterals or other property belonging to any other bank than the Gardiner bank; that it was operated by separate officers, which was likewise the condition with reference to the Butte and Billings banks.

An inspection of the exhibits referred to show three reports by the Gardiner bank which were published under dates of April 3, September 14 and December 31, 1923. Neither of these statements indicates that the Gardiner bank could not have paid its creditors in full in the ordinary course of business. The one filed December 31 not only indicates a solvent condition but shows that the bank then had not only an unimpaired capital stock but undivided profits.

The foregoing presents the facts sufficiently to demonstrate [1] that the question presented is as stated by relator's counsel: Are the assets of each bank to be distributed to the depositors and creditors of such bank, or shall the assets of the three banks be marshaled as a common fund for the joint benefit of all creditors?

At the threshold it is apparent that a solution of the question requires an examination of our state banking law with some reference to its historical background. Banking was carried on in the placer mining districts of what is now Montana even before the creation of the territory. In the beginning the business was conducted wholly by individuals and copartnerships. While a national bank was chartered as early as 1866 and other charters were granted in the '60's and '70's, the first statutes designed to regulate the business of banking in the territory were passed in 1887 (Comp. Stats., 5th Div., Chaps. 27, 28), and these of course related only to Montana corporations; but these statutes did not provide for any special supervision over the business.

Section 5 of Article VII of the Constitution authorized the legislative assembly to provide for a state examiner. "His duty shall be to examine the accounts of state treasurers, supreme court clerks, district court clerks and all county treasurers and treasurers of such other public institutions as may be prescribed by law, and shall perform such other duties as the legislative assembly may prescribe." The legislative assembly obeyed this mandate in 1895. Sections 350 and 497 of the Political Code provided for the appointment of a state

examiner and fixed his term of office.    Section 498 prescribed his duties, among which were that he should "visit each year without previous notice each of the banks, banking corporations and savings banks, investment and loan companies, incorporated under the laws of this state, or doing business under any law of the state concerning corporations, and to examine into their affairs and ascertain their financial condition  *  *  *  ."

In 1899 the duties of the state examiner with respect to banking corporations were extended; provisions were made as to his duties as well as of those of the governor and attorney general in case an impairment of the capital, or the insolvency, of a bank were found to exist; provision was made also for the appointment of a receiver to wind up the affairs of the corporation, and pending the application for the receiver the governor was empowered to direct the state examiner to take charge of the business of the corporation until the appointment of the receiver. (Substitute for Senate Bill No. 87, sec. 2, 1899 Session Laws, p. 103, which became section 4004 of the Revised Codes of 1907.)

In 1905 all banking institutions under the control of the state examiner were required to make, at his call, not less than four reports during each year, not less than two calendar months to intervene between each call, according to the form prescribed by him. The statement was required to contain a full abstract of the general accounts of the bank so as to exhibit in detail under appropriate heads the resources and liabilities of the bank so the amount and kind thereof might be plainly disclosed. It was also required that a statement of the bank's condition in such condensed form as might be required by the state examiner should be published once a week in a newspaper of general circulation in the place where the bank was located. The state examiner also was given power to call for special reports from any particular bank whenever in his judgment he desired full and complete knowledge of its condition. (1905 Session Laws, Chap. 19, p. 44.)

In 1909 section 4004 of the Revised Codes of 1907 was amplified considerably. (Session Laws 1909, Chap. 141, p. 218.)

Still no attempt was made to control or regulate private banks or bankers. But in 1911 the Twelfth Legislative Assembly determined to place them, so far as was deemed practicable, under the superintendency of the state examiner, consistently with the policy then employed with respect to banking corporations. For that purpose Chapter 111 of the 1911 Session Laws (pp. 200–204) was enacted. That the state has the right to so regulate the business of banking by whomsoever conducted (national banks excluded) is beyond question. (*State* v. *Richcreek*, 167 Ind. 217, 119 Am. St. Rep. 491, 5 L. R. A. (n. s.) 874, 77 N. E. 1085; *Blaker* v. *Hood*, 53 Kan. 499, 24 L. R. A. 854, 36 Pac. 1115; Michie on Banks & Banking, sec. 3; Magee on Banks & Banking, secs. 1, 2.)

By Chapter 111, *supra*, it was made unlawful for any person or persons "to conduct a commercial banking business, or a banking business of discount and deposit within the state of Montana in the capacity of an individual or of a copartnership, or of an unincorporated association, unless the name under which the bank is known or conducted shall contain the name of such individual, or the name of at least one responsible member of such copartnership or association * * * ."

Section 2 provided that every individual, copartnership or association intending to conduct a bank or banking business within this state shall, before the receipt of any money whatsoever on deposit, actually own and possess within the state approved property or assets not exempt from execution of not less than $20,000, in cities and towns having a population of 2,000 or less; in cities and towns having a population of over 2,000 and less than 5,000 the sum of $30,000; in cities having a population of 5,000 and less than 10,000 the sum of $50,000; in cities having a population of 10,000 and less than 25,000 the sum of $75,000; and in all cities having a population of 25,000 or over, the sum of $100,000, "which financial condition must

appear and be carried on the books of any such bank or banks. Such requirement shall extend to each and every private bank conducted by any person, copartnership or association, and no asset or assets shall appear on the books of more than one bank." This last provision evidently contemplated that the same individual, copartnership or association might conduct more than one bank in Montana.

Section 3 provided for the examination of such bank or banks by the state examiner once a year and oftener when deemed necessary by him, and he was given full power and authority to investigate and examine all the books, papers and effects of any such bank or banking house for the purpose. of ascertaining the financial condition of the same.

Section 5 provided that the cashier of any such bank, when so directed by the state bank examiner, should make a report to the bank examiner at his call. Four reports each year, and special reports, if called for by the state bank examiner, were required. It is clear that section 5 was based upon the language of section 1 of the 1905 Act, *supra.* Sections 6, 7, 8 and 9 of the Act followed substantially section 4004 of the Revised Codes of 1907, as amended by Chapter 141 of the Laws of 1909.

Section 12 provided if the state examiner, or his deputy, shall fail to perform any duty imposed upon him under the provisions of the Act, or if any person or member of any copartnership or association, shall violate any of the provisions, he shall be guilty of a felony.

Chapter 111 has been carried forward without substantial change, sections 1, 2, 3, 5, 9, 12 and 13 now being, respectively, 6095, 6096, 6097, 6099, 6103 and 6106, Revised Codes of 1921. That Chapter 111 was enacted for the purpose of extending the power of the state examiner over private banks, copartnerships and associations in a manner consistent with his supervision over incorporated banking institutions is clear. Further confirmation of this purpose was evinced in 1915, when the

legislative assembly enacted the Bank Act. (Chap. 89, Laws 1915, p. 118.) By that Act the state examiner was given the title of superintendent of banks. Section 24 thereof, now 6043, Revised Codes of 1921, provides in part that "no person, firm, company, copartnership or corporation, either domestic or foreign, not subject to the supervision of the superintendent of banks and not required by the provisions of this Act to report to him, and which has not received a certificate to do a banking business from the superintendent of banks," shall do certain prohibited things, which, without reciting them, particularly relate to the transaction of a banking business.

Section 25, now 6044, Revised Codes of 1921, provides in part that every person, firm, company, copartnership or corporation, domestic or foreign, advertising that he or it is receiving or accepting money or savings and issuing notes or certificates of deposit therefor, or advertising that he or it is transacting the business of a bank, savings bank or trust company, or making use of any office sign at the place where such business is transacted, having thereon any artificial or corporate name or other words indicating that such place or office is the place or office of a bank, savings bank or trust company * * * must have received from the superintendent of banks a certificate to do a banking business. Penalties are provided for a violation of the provisions of the section.

By the provisions of section 50, now 6069, Revised Codes of 1921, every bank except a reserve bank, shall "maintain at all times a reserve of at least ten percentum of its deposit liabilities. * * * Whenever the reserve of any bank shall fall below the amount required herein to be kept, such bank shall not increase its loans or discounts otherwise than by discounting or purchasing bills of exchange, payable at sight or on demand, and the superintendent of banks shall notify any bank whose reserve may be below the amount herein required, to make good such reserve, and in case the bank fails, for thirty

days thereafter, to make good such reserve, the superintendent of banks may notify the attorney general, and he shall institute proceedings for the appointment of a receiver and to wind up the business of the bank.'' And section 2 of the Act, now 6015, Revised Codes of 1921, specifically provides that ''any person, firm or association now doing a private banking business'' shall come under all of the provisions of section 50 (6069), *supra.*

At this point Chapter 90 of the 1923 Session Laws (page 240) seems of especial importance. It emphasizes the manifest purpose of the law-making body to extend the control of the state over all banking institutions (except federal), incorporated or unincorporated, in harmony with the general supervisory scheme. Subdivision 1 of section 6014$a$ defines ''capital'' in case of a private bank as ''that fund set aside and dedicated for capital purposes.'' Subdivision 8 says the term ''unincorporated bank'' shall comprehend ''private banks'' and shall include every unincorporated person, firm or association transacting banking business in this state. and the term ''board of directors'' shall include the owner or owners of such bank, while subdivision 10 declares that ''a bank is insolvent within the meaning of this Chapter when all of its capital, surplus, and undivided profits are absorbed in losses and the remaining assets will not be sufficient to pay and discharge its contracts, debts and engagements.''

From the foregoing it would seem clear that it was the intention of the legislative assembly in enacting the 1911 statute to treat and regulate a private bank as a business entity. More than that, as a *quasi*-public institution, and that intention has been emphasized by every succeeding enactment on the subject. In proof of which we observe that a bank operated by an individual, a copartnership, or an association is required to have a certain amount of capital; those conducting such bank are required to publish statements at certain times advising the

public of the assets and liabilities of the bank,—the statement required is with reference to the financial condition of the bank, not of its owner or owners. It is the duty of the superintendent of banks to investigate the condition of these banks for the protection of the public; he is required to examine the financial condition of the banks, not of the owners of the banks. The bank is required to show a certain amount of capital and if upon investigation by the superintendent of banks it be found that the capital has become impaired the individual or copartnership or association is required to make good the impairment. If the individual or copartnership or association be conducting two or more banks it was contemplated that such bank should conduct its business without reference to the other; it was provided that the assets of one bank should not be reckoned as the assets of another. It was contemplated that one bank might be solvent and another insolvent, that the capital stock of one bank might be impaired and the other unimpaired. Again, note the significant language of the last pronouncement of the legislature on the subject that a certain fund is *set aside and dedicated* for capital purposes. In a nutshell it may be declared that, if the law is to be regarded with a common-sense aspect of its purpose, it was intended clearly that each bank should be considered and treated as a separate entity, regardless of its ownership.

The circuit court of appeals for this circuit came to the same conclusion in *In re Yegen,* 1 Fed. (2d) 841. That was a case in which, as here, it was alleged that Christian Yegen and Peter Yegen owned and conducted as partners private banks in the cities of Butte, Billings and Gardiner. Depositors in the Butte bank filed a petition in the bankruptcy court for an adjudication of the partnership of Yegen Bros., and each of them individually, on the ground that the appointment of a receiver for the Butte bank by the state court was an act of bankruptcy within the meaning of the Bankruptcy Act. Judge

Bourquin dismissed the petition, and the depositors appealed. The circuit court of appeals observed that under the Montana banking laws each private bank is deemed and treated as having an identity separate and apart from the owners thereof, and from other banks owned by them. "It is the bank as an institution which the state thus undertakes to supervise and regulate, and not the owner thereof. A bank may be insolvent, as defined by the state law, because of the impairment of its capital and assets, and the owner be solvent. So, too, the same person or association may own two or more banks, and one of them be insolvent and the other solvent, within the meaning of such law." The court went on to say that the receiver of the Butte bank was appointed because of the insolvency of the bank, not of its owners. "It was, in a sense, the particular business or enterprise in which the alleged bankrupts were engaged which was found to be insolvent, and for which the receiver was appointed, and not the parties owning the business."

The supreme court of Missouri, in *State ex rel. Barker* v. *Sage,* 267 Mo. 493, 184 S. W. 984, after a careful consideration of the statutes of that state, which bear a general similarity to our own, and a constitutional provision almost identical with our own (Const., Art. XV, sec. 18), declared that the private bank in question was an entity and a separate institution from all other business of its owner, an individual. In an action arising upon the same matter (the property of Sage, a bankrupt) in which the case turned on the point whether the federal or state court first obtained jurisdiction over the bankrupt's property, the circuit court of appeals for the eighth circuit, while saying there was no occasion to differ from the supreme court of Missouri as to its theory of the banking laws of that state, did differ in some particulars, notably as to whether the legislative Act of Missouri had created a "new legal entity." (*State of Missouri* v. *Angle,* 236 Fed. 644, 149 C. C. A. 640.)

We need not take the time to discuss the conflict between those decisions. Nothing said in the *Angle Case* seems to us persuasive against the conclusion to which we have come in the instant case.

But, it is urged, the firm of Yegen Bros. Bankers, consisting of Christian Yegen and Peter Yegen, is a general partnership. It could not be a special partnership, for in this state a special partnership may not be formed for the transaction of a banking business. (Sec. 8025, Rev. Codes 1921.) And every general partner is liable to third persons for all obligations of the partnership, jointly with his copartners. (Sec. 8004, Rev. Codes 1921.) The situation is not free from difficulty. Christian Yegen and Peter Yegen, copartners as Yegen Bros., Bankers, were and are the owners of the banks. Suit by or against the banks before the insolvency thereof must have been brought by or against the owners. Each depositor in the bank is a creditor not only of the bank but of Yegen Bros., a copartnership, and the individuals composing that partnership. But, as we have seen, each bank is an entity, a *quasi*-public institution, a banking concern over which the state has extended its superintending authority.

If the assets of either bank be insufficient to pay the creditors, Yegen Bros., copartners, and the Yegens individually are liable until the creditors are paid. But this does not affect the question whether the creditors of the several banks have a preference to the assets of the banks of which they severally were depositors.

Are the depositors of the Gardiner Bank entitled to treat the assets of that bank as impressed with a trust in their favor?

We think, upon the plainest principles of justice, that they are. Regarding the Gardiner bank as an entity, as we must, we observe that the interveners deposited their money in a bank which they were justified in believing was a solvent concern, able to repay on demand. They were justified in believing that the affairs of the bank were being conducted prop-

erly. The fact that the bank was permitted to run, impliedly bore the stamp of approval of the superintendent of banks. The statements published in accordance with law, not only did not warn the interveners of insecurity but lulled them to believe the bank as sound as the statements indicated. They were not called upon to investigate the condition of the Yegens. Nor was the superintendent of banks. How could the superintendent of banks have investigated the condition of the two Yegens? The law does not give him any such authority. (See discussion in *State ex rel. Barker* v. *Sage, supra*.)

In view of our statutes the idea (if it be entertained by anyone) that because an individual owns a banking institution he may do as he pleases with its capital, and other assets, regardless of the rights of the creditors, is as fanciful as it is fallacious. The fund which is "set aside and dedicated for capital purposes" is a trust fund for the benefit of the bank's creditors. It is like unto the capital stock of the banking corporation. This is in harmony with the settled doctrine of the American courts, which is, that the capital stock, and other property of a private corporation, is deemed a trust fund for the payment of its creditors. (Story's Equity Jurisprudence, sec. 1660; Thompson, Commentaries on the Law of Corporations, secs. 1569, 6492.)

It is a universally recognized principle in equity jurisprudence that the assets of an insolvent corporation, or association, comprise a trust fund for the benefit of its creditors. (*Merchants National Bank of Richmond* v. *National Bank of Lillington*, 231 Fed. 556; *Bank of Springfield* v. *Williams* (S. D.), 205 N. W. 221; *State ex rel. Barker* v. *Sage, supra;* Pomeroy's Equity Jurisprudence, sec. 1046.)

It follows that the assets of the Gardiner bank are impressed with a trust in favor of the creditors of that bank, and likewise the assets of the Billings and Butte banks are impressed with a trust in favor of their respective creditors. Such being the case the application of the relator seeking to have the assets of the three banks marshaled to the end that it may

share in the total assets is without merit and the relief sought must be denied.

The order to show cause is discharged and the proceeding dismissed.

*Dismissed.*

ASSOCIATE JUSTICES HOLLOWAY, GALEN, STARK and MATTHEWS concur.