STATE EX REL. RANKIN, RESPONDENT, *v.* YEGEN,
APPELLANT.

(No. 6,091.)

(Submitted March 30, 1927.  Decided April 21, 1927.)

[255 Pac. 744.]

*Banks and Banking—Equity—Powers of District Court Over Receivers—Sale of Real Property of Bank—Confirmation—Discretion.*

Banks and Banking—Receivers—Extent of Jurisdiction of Court of Equity.
1. The right of a court of equity to appoint a receiver in a proper case is one of the inherent prerogatives of the court which it may exercise in aid of its jurisdiction; when it assumes jurisdiction it retains it for all proper and necessary purposes, and by its order appointing a receiver it takes the entire subject matter of the litigation out of the control of the parties and ultimately disposes of all questions, legal and equitable, growing out of the proceeding.

Same—Constitution—Departments of State Government—District Court's Power Over Receivers and to Confirm Sale of Bank Property—Statute—Construction.
2. Section 1, Article IV, of the state Constitution prohibits either one of the three departments of state government from trenching upon the prerogatives of the other, and under that section *held* that the contention that the legislature intended by providing in section 6103, Revised Codes of 1921, that a receiver appointed to take charge of an insolvent state bank shall conduct its affairs under the supervision of the state bank examiner, etc., that the district court, which is responsible for the acts of the receiver, its appointee, should be deprived of authority to give directions to him or to confirm a sale of the bank's property cannot be sustained.

Same—Confirmation of Sale of Bank's Property, as Against Objections Based on Doubtful Reorganization Plan—Discretion.
3. *Held*, that the district court did not abuse its discretion in overruling objections to confirmation of sale of the real property of a private bank in the hands of a receiver, based upon an alleged reorganization plan so doubtful, incomplete and indefinite as to warrant the court in holding it impracticable.

---

[1]  Equity, 21 C. J., sec. 117, p. 134, n. 5.  Receivers, 34 Cyc., p. 101, n. 84, p. 183, n. 41.

[2]  Banks and Banking, 7 C. J., sec. 12, p. 482, n. 64 New.  Constitutional Law, 12 C. J., sec. 234, p. 803, n. 10.

[3]  Banks and Banking, 7 C. J., sec. 522, p. 743, n. 74 New.

1. Power of court of equity to appoint receiver, see 23 R. C. L. 32.

*Appeal from District Court, Silver Bow County; Wm. E. Carroll, Judge.*

Proceeding by the State of Montana, on the relation of Wellington D. Rankin, Attorney General, against Christian Yegen and Peter Yegen, copartners conducting private banks within the state of Montana, at Butte and elsewhere, under the firm name and style of Yegen Bros., Bankers. Subsequently Christian Yegen filed objections to the confirmation of a sale of certain real estate constituting part of the assets. Objections were denied, the sale was confirmed and Christian Yegen appeals. Affirmed.

*Messrs. Wood & Cooke,* for Appellant, submitted a brief; *Mr. Sterling M. Wood* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Messrs. Kremer, Sanders & Kremer,* for Respondent, submitted an original and a supplemental brief; *Mr. Louis P. Sanders* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

On and prior to February 28, 1924, Christian Yegen and Peter Yegen, copartners as Yegen Bros. Bankers, were conducting a general savings and commercial banking business at Butte, Montana. On that day the state examiner, after a careful examination into the affairs of the bank, determined that its assets were greatly impaired and so reported to the governor. The governor, on March 6, 1924, directed the attorney general to institute proceedings in the district court of Silver Bow county for the appointment of a receiver of the bank. In this proceeding the court, on March 24, 1924, made and entered an order in which it was recited that "the defendants, Yegen Bros., Bankers, have conducted their business in an unsafe and unauthorized manner, and that it is unsafe and inexpedient for the defendants to longer continue

to transact business, and that the interests of the creditors of said Yegen Bros., Bankers, and the public require that defendants' assets should be taken from the control and management of said defendants and preserved for the benefit of the persons entitled thereto; that said defendants are heavily indebted and are so involved that it is impossible for them to meet the claims due and to become due upon said bank; that their assets are scattered and of a kind that it is impossible to realize upon them at once without a great sacrifice; that the cash on hand is not sufficient to meet the daily checks and demands; that said bank of said defendants, Yegen Bros., Bankers, is greatly impaired and insolvent,'' and thereupon appointed a receiver with the powers usual in such cases.

The receiver duly qualified and entered upon the duties of his trust. On June 19, 1926, he applied to the court for an order empowering and directing him to sell certain real estate generally known as the Yegen Bros. Banking building. The court granted the order with directions as to the method of sale. On August 31 the receiver made a return to the court wherein he set forth that after due publication of the time and place of sale, he had offered the property for sale to the highest bidder at public auction, and that Louis Dreibelbis, who was the highest and best bidder, had offered the sum of $90,500, and had deposited a certified check equal to ten per cent of the amount bid. The receiver prayed that the sale be confirmed, and that he be authorized and directed to execute to the purchaser a good and sufficient deed conveying the property. A hearing upon the return was fixed for September 11, 1926. On August 31, 1926, Christian Yegen, describing himself as one of the defendants, filed objections to the confirmation of the sale, and supplemented his objections by a document filed with the court on September 11, 1926. Mr. Yegen did not object to the confirmation of the sale upon the ground that it had not been conducted in accordance with the law, nor that the sum bid for the property was inadequate. His objection presents an anomalous situation. He represented that on or about August 12, 1926, he had ''mailed to the

creditors of the above-named defendants a letter and petition," copies of which were attached to his written objection. In the letter he said to the creditors: "I am willing to devote the balance of my life to the work of realizing upon the assets of these several banks at their proper value so that you and all other creditors will be paid in full. As one intimately familiar with the business of the banks which I helped to build I feel that I am better able to do this work than strangers. Attached to this letter is a petition to the court which outlines my plan of action. Please consider it carefully. If you approve, as I hope you will, please date, fill in and sign the petition and mail to me at Box 1016, Billings, Montana, without delay. If a sufficient number of creditors respond I will present the petitions to the court and try to have favorable action taken." The "plan of action" as set forth in the "petition" contemplated that Mr. Yegen would undertake: (a) "To organize a corporation under the laws of the state of Montana to take over the assets in the hands of . the receiver of Yegen Bros. Bankers at Butte, Gardiner and Billings; (b) To pay for such assets a sum equal to the claims of all creditors of said banks by the issuance of the notes or bonds of the corporation for such sum, payable on or before ten years, with interest at the rate of four per cent per annum, the amount paid to each receiver to be the proportion of such sum which the assets in his hands bear to the total assets of all of the banks; (c) To devote his entire time to the administration of the affairs of said corporation and to work out its assets as economically and speedily as possible so the said notes or bonds will be paid." It was to be understood in connection with the foregoing offer: "(d) That the various surety companies who had to pay the bonds securing deposit of public moneys in the various banks of Yegen Bros. Bankers, shall not be treated as creditors for the purpose of the notes or bonds mentioned, but that the said Chris Yegen will cause the said surety companies to reduce their claims twenty per cent, and that the balance of eighty per cent thereof shall be paid as follows, to-wit: The sum of $27,200.00 thereof out of

the first earnings of the said corporation, and that the balance of eighty per cent shall be secured by first mortgage on the Butte bank building and shall be payable without interest over a period of years, not exceeding ten years; (e) That the surety companies referred to will advance all the funds necessary to organize the corporation mentioned and to carry out the plan outlined above, and that they shall be reimbursed for these expenditures from the earnings of the corporation before any interest upon or principal of the aforesaid notes or bonds is paid."

He represented to the court that creditors, approximately 700 in number, whose approved claims filed with the receiver aggregated $470,741.91, had signed the petitions asking the court that the offer be accepted. In the supplemental objection he represented that other and further petitions, 358 in number, representing approved claims totaling $142,841.03, had come into his hands, and that he was continually receiving others, and that a majority in interest of the approved and unapproved claims filed with the receiver were represented by the petitions.

When the matter came on for hearing, on September 11, the court heard the statements of counsel for Mr. Yegen, as well as those of counsel for the receiver. Counsel for the receiver said to the court that the receiver's attitude in the matter was to use his best efforts to do all he could to advance the welfare of the trust, and if the court should be of the opinion that any good could be accomplished by reselling the property, or through a reorganization, the receiver would not stand in the way. The court thereupon took the testimony of Mr. Yegen and of Mr. Wood, his counsel, and after consideration denied Mr. Yegen's objections. The court then inquired if there were any other or further bids for the property. Mr. I. Simon then bid $99,650, and the United States Building & Loan Association $100,150. No other bids being offered the court accepted that of the United States Building & Loan Association and made an order confirming the sale. From this order Christian Yegan has appealed.

1. In *State ex rel. Butte Fruit & Produce Co.* v. *District Court,* 75 Mont. 567, 24 Pac. 489, we traced the history of our statutes respecting the examination and supervision of banking institutions by the state authorities, with especial reference to private banks. The matter under consideration in that case had to do with the private banks of Yegen Bros. In the opinion it was pointed out that the Twelfth Legislative Assembly, by the enactment of Chapter 111 (Session Laws of 1911, pp. 200–204), had placed private banks, so far as was deemed practicable, under the superintendency of the state examiner, consistently with the policy then employed respecting state banking corporations in general.

Section 3 of the Act, now section 6097, Revised Codes 1921, provides for the examination of such bank or banks by the state examiner once a year, and oftener when deemed necessary by him, and he is given full power and authority to investigate and examine all the books, papers and effects of any such bank or banking houses for the purpose of ascertaining the financial condition of the same.

In section 6 of the Act, now 6100, Revised Codes 1921, it is provided that whenever the state examiner, after a full and careful examination of the affairs of any such bank, shall find evidence of any impairment of the property or assets thereof, or evidence of the insolvency of any such person, copartnership or association, "he shall immediately prepare and submit his statement of its condition to the governor and the attorney general and if the governor and attorney general are satisfied from such statement that such impairment or insolvency exists, they shall order the state examiner to notify the person or persons, copartnership or association conducting such bank to make good such impairment or insolvency within a specified time, or the said governor and attorney general may order the said state examiner to immediately take charge of such bank, * * * ."

In section 8 of the Act, now 6102, Revised Codes 1921, it is provided that if the person or persons conducting such bank do not make good the impairment or insolvency within

the time prescribed, after notification, the state examiner is authorized to take charge of the bank and of its property and assets upon the direction of the governor and attorney general.

Section 6103, Revised Codes 1921, provides: "If it appears necessary to have a receiver appointed for such bank or banking business, the state examiner shall make full and complete report of the condition of the assets and liabilities of such bank to the governor, and thereafter, if it shall appear to the governor that a receiver is necessary, he shall thereupon direct the attorney general to file his petition in the district court of the county in which such bank is located, asking for the appointment of a receiver in the name of the state of Montana, and such petition shall be controlling, and shall be by the court so considered and acted upon even though the depositors or creditors or other persons may have theretofore filed application for the appointment of a receiver. When any such petition is filed as herein provided, no suggestion shall be contained therein as to the person to be appointed by said court to act in such capacity. Receivers of all such insolvent banks appointed under the provisions of this Act shall conduct said bank so taken charge of under the supervision of the state examiner, and the state examiner shall take such steps with reference to said bank as he shall think advisable, either to close up the affairs of said bank in accordance with law, or to place said bank in a solvent condition. The receiver herein provided for is subject to the same restrictions *as other receivers* and liable to removal for a dereliction of duty whenever the court may deem it advisable so to do."

The section, except for the words italicized, is a re-enactment of section 9 of the 1911 Act. The italicized words were written into section 6103 by the Code Commissioner in supposed compliance with the directions of Chapter 195 of the 1919 Session Laws, p. 408 et seq. Through oversight the Codes as compiled and revised by the commissioner were not adopted by the legislative assembly until the session of 1925, when, both as to form and substance, they were "approved, legalized, and adopted." (Chap. 54, Session Laws, 1925, p. 73.)

Counsel for appellant says we must consider the effect of section 6103, supra, as if the italicized words were not included therein for the reason that the section as it now exists was not in force until the approval of Chapter 54, supra. We shall proceed upon that theory.

The italicized words being omitted, counsel argues that the language of the section compels the conclusion that the power of the district court with respect to the receivership of a private bank is confined to two acts only, (1) the appointment of the receiver, (2) the removal of the receiver for dereliction of duty. All other power with respect to the receivership, says counsel, is reposed in the state examiner in virtue of this language: "Receivers of all such insolvent banks appointed under the provisions of this Act shall conduct such bank so taken charge of under the supervision of the state examiner, and the state examiner shall take such steps with reference to said bank as he shall think advisable, either to close up the affairs of said bank in accordance with the law, or to place said bank in a solvent condition." He asserts that the concluding sentence of the section as enacted in 1911, "The receiver herein provided for is subject to the same restrictions and liable to removal for a dereliction of duty whenever the court may deem it advisable so to do," is in harmony with his contention. He argues that the words "same restrictions" refer to the next preceding sentence, and "necessarily have to do with the affairs of the bank, by closing it up or placing it in a solvent condition," and that the restrictions contemplated are those imposed, or which may be imposed, by the state examiner. Hence, he concludes "there is no opportunity to contend that the district court at Butte, which made the order here confirming the sale of real estate, had any power at all to so act," and it follows the district court was without jurisdiction in the matter.

The statute provides that application shall be made to a court of equity for the appointment of a receiver. To that extent the court's jurisdiction is conceded. That concession having been made settles counsel's contention against him.

The right of a court of equity to appoint a receiver in a
[1] proper case is inherent. It is one of the prerogatives
of the court exercised in aid of its jurisdiction. (*Galloway*
v. *Campbell*, 142 Ind. 324, 41 N. E. 597.) When the court
assumes jurisdiction it retains it for all proper and necessary
purposes. "A court of equity by its order appointing a receiver
takes the entire subject matter of the litigation out of the con-
trol of the parties and into its own hands, and ultimately
disposes of all questions, legal or equitable, growing out of the
proceeding." (High on Injunctions, 4th ed., sec. 4.)

"When a district court in a suit brought by the state for
that purpose appoints a receiver to wind up the affairs of
a banking corporation, it thereby secures to itself full juris-
diction to adjust all rights, interests, claims and demands,
legal or equitable, relating to the bank's estate or growing out
of its administration, and to control, at its discretion, all con-
troversies affecting the subject matter of the receivership."
(*State ex rel. Godard* v. *State Bank of Circleville*, 84 Kan.
367, 114 Pac. 381.)

The receiver is the appointee of the court, not of the state
examiner. By the statutes we are considering, the state ex-
aminer is not given power to appoint a receiver. The court
is responsible for the actions of the receiver; the state examiner
is not. The court, and not the state examiner, is administer-
ing the trust through its agent, the receiver. Under these con-
ditions it cannot be admitted that the state examiner has the
authority to give directions to a receiver regardless of the di-
rections of the court. Otherwise we might have an unseemly
conflict of authority, in which case we should have a member
of the executive department of the government interfering
with a proper prerogative of the judicial department.

"A department without the power to select those to whom
it must intrust part of its essential duties cannot be inde-
pendent. If it must accept as 'ministers and assistants,' as
Lord Bacon calls them, persons selected for them by another
department then it is dependent on the department which
makes the selection. To be independent the power of the

judiciary must be exclusive, and exclusive it cannot be if the legislature may deprive it of the right to choose those with whom it shall share its labors or its confidences." (*State ex rel. Hovey* v. *Noble,* 118 Ind. 350, 10 Am. St. Rep. 143, 4 L. R. A. 101, 21 N. E. 244.)

Our Constitution expressly prohibits any person or collection of persons charged with the exercise of powers properly belonging to one department of the government from exercising any powers properly belonging to either of the others, except where expressly directed or permitted by the Constitution itself (Art. IV, sec. 1), and it is not contended that there is any such exception in this instance. Hence, we have said that under our division of governmental powers, it is essential that neither department of the government shall be permitted to trench upon the prerogatives of the other. (*State ex rel. Reid* v. *District Court,* 68 Mont. 309, 218 Pac. 558; *State ex rel. Schneider* v. *Cunningham,* 39 Mont. 165, 101 Pac. 962.)

We shall not assume that the legislative assembly intended [2] to make such a conflict possible. In imposing upon the state examiner, now also called the superintendent of banks, the duty of supervising all banking institutions in this state (except national banks) it was the purpose of the legislative assembly to provide the means of establishing a harmonious system for the conduct of the business of banking in Montana and to provide safeguards for the protection of those engaged therein, as well as for those who entrust their money to such institutions. This same purpose is apparent when we consider the statutory directions respecting banks whose assets have become impaired and those approaching insolvency or actually insolvent. It frequently happens that the state examiner is in charge of a bank when a receiver is appointed. It would seem that to the legislative mind it appeared advantageous to supply the aid of the state examiner, already somewhat conversant with the bank's affairs, to the court and its receiver. It is presumed that the state examiner, familiar with banking conditions in the state, and supposedly familiar with the condition of the particular bank, is in an advan-

tageous position to render assistance. That portion of section
6103, which is to the effect that the receiver shall conduct
the bank under the supervision of the state examiner and that
the latter shall take such steps with reference to the bank
as he shall think advisable, either to close up its affairs or
to place it in a solvent condition, must be held to relate merely
to matters of administrative detail in the conduct of the re-
ceivership. It cannot relate to those matters which require
judicial action, nor can it be held to interfere in any way
with the directions of the court given to the receiver. Any
other interpretation of the statute would lead to absurd re-
sults and would impinge upon the provision of the Constitu-
tion above noted. (*State ex rel. Rowell* v. *Wildes,* 34 Nev.
94, 116 Pac. 595.)

How could the receiver convey title to the property of the
bank which it might be necessary to sell or dispose of, without
the confirmatory action of the court? The state examiner is
not empowered to sell real estate; if he has not the power and
the court had not the power, so far as the receivership is con-
cerned it does not rest anywhere. But we are not confronted
with any such anomalous situation. The court had jurisdic-
tion to grant the order of sale, from which no appeal was taken,
and also complete jurisdiction to confirm the sale if lawfully
made.

2. The next question is whether the court abused its dis-
cretion in so doing.

The good faith, the magnanimity of purpose, of Mr. Yegen
[3] may be readily conceded. His offer to devote the re-
mainder of his life, if need be, to paying in full the creditors
who deposited money with Yegen Bros. Bankers upon the faith
and credit of the Yegen name, is worthy of the highest com-
mendation.

Had the court refused to confirm the sale, lawful in all
respects, it must have done so in reliance upon the plan pro-
posed. An examination of Mr. Yegen's testimony reveals that
many important and necessary details of the plan had not been
worked out. He proposed to organize a corporation to take

over all the assets of Yegen Bros. Bankers at Butte, Billings and Gardiner, as well as the other assets of the Yegen brothers, which were considerable, but the record does not disclose their value. The definite character of the corporation is not made to appear. At the hearing Mr. Yegen had not determined even as to the incorporators. Who were to be the stockholders and who the directors? It is inferable that the creditors were to be stockholders in some way. Mr. Yegen was to be the controlling factor, the dictator with absolute power. It would seem that the directors were to be mere figureheads.

At the time of the hearing there was approximately $50,000 in the hands of the receiver of the Butte bank. This was to be turned over to Mr. Yegen to use as he saw fit. Asked as to what he intended to do with this money he said he would invest it or loan it or do whatever he pleased with it.

Certain surety companies, it seems, had been obliged to pay $180,000 on account of public moneys which had been deposited in the Yegen banks. It was assumed that the surety companies would discount their claims for this much money twenty per cent (although it was not shown that the companies had bound themselves to do so). To secure the payment of the eighty per cent the companies were to receive $27,200 out of the first earnings of the corporation, the remainder being secured by a first mortgage on the Yegen brothers banking building at Butte, "payable without interest over a period of years, not exceeding ten years." At the hearing it was suggested that the surety companies might and probably would forego the privilege of receiving the $27,200 out of the first earnings of the corporation. In that event the entire eighty per cent would be secured by the mortgage. The other creditors were to be paid by the issuance of notes or bonds of the corporation "payable on or before ten years, with interest at the rate of four per cent per annum." What other security, if any, would be given the creditors, other than the surety companies, the record does not reveal; the necessary inference is —none.

The plan contemplated that the surety companies would advance all the funds necessary to reorganize the corporation and carry out the plan, but nothing is more indefinite in the record than the supposed obligations of the surety companies with respect to this feature of the scheme. The plan contemplated that upon the issuance of the notes, bonds and mortgage to the surety companies, Christian and Peter Yegen would be relieved of personal liability upon their debts; but, in fairness, it must not be forgotten that as a quid pro quo they were to turn over all their property to the corporation. As a part of the plan of operation of the corporation it was proposed to engage in active business at least to the extent of operating the store of Yegen Bros., which as Mr. Yegen testified, was the foundation of the entire business: "I started that store forty-four years ago and it has been a successful business all the way through and can be made a successful business now if it is handled the way we have been handling it." He would have to have something to live on, but his own services would not entail a cost of over three or four thousand dollars a year, and it would seem that he intended to retain the services of his brother Peter at two thousand a year. Certainly no criticism can be advanced against the amount of the salaries suggested. It was expected that the bank building at Butte would bring in a rental of $100,000 during the ten-year period and the corporation would still own the building.

The liabilities of the banks at Butte, Billings and Gardiner aggregated about $1,900,000. There were about 2,400 active depositors in the Butte bank, but the number of depositors in the banks at Billings and Gardiner is not stated. It will be seen that the annual interest upon $1,900,000 at four per cent is $76,000.

The court concluded that there was not a reasonable assurance of the ultimate success of the plan, and was not impressed with its practicability; concluded that it created a preference in favor of the surety companies which was prejudicial to the creditors at large. The court observed that if

the reorganization plan came within the provisions of section 6109i of Chapter 90 of the Session Laws of 1923, page 246, it would require the concurrence of creditors representing eighty per cent of the amount of the deposits of the bank and that condition had not been met; if upon the other hand it should be held that the 1923 law did not apply, then the court would not dismiss the proceedings, discharge the receiver, and turn over the management to Mr. Yegen unless all the creditors consented, or provision be made by ample security that those not consenting would be protected. And in that event, said the court, it was likely that the creditors not consenting might demand dollar for dollar. The court discussed certain features of the plan which it deemed inequitable and thereupon denied the objections and made its order confirming the sale. In conclusion it is sufficient to say that it certainly cannot be said that in so doing the court abused its discretion.

The order is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN concur.

Rehearing denied April 29, 1927.